FILED

11/03/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020[1]

**STATE OF TENNESSEE v. KENDALL RIVERS**

**Appeal from the Criminal Court for Knox County**
**No. 113503     Scott Green, Judge**

_____

**No. E2019-01541-CCA-R3-CD**
_____

The defendant, Kendall Rivers, appeals his Knox County Criminal Court jury conviction of voluntary manslaughter, claiming that the trial court erred by admitting into evidence a video recording taken from the defendant's cellular telephone, by imposing the maximum sentence, and by ordering the defendant to serve his sentence in confinement.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Kendall Rivers.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand jury charged the defendant with one count of second degree murder for the January 30, 2018 death of the victim, Michael Crosby.

At the May 2019 trial, Victoria Loveday, who lived next door to the victim, testified that, on the evening of January 30, 2018, she heard two men arguing outside and that "it sounded like they were in front of my window."  Ms. Loveday walked to the back

---

[1]     The defendant originally requested Oral Argument in this case.  With the assent of the parties, this court moved the case to the On-Brief Docket due to the suspension of in-person court proceedings due to the Covid-19 pandemic.  *See In Re: Covid-19 Pandemic*, No. ADM2020-00428 (Tenn. Apr. 24, 2020) (Order).

of the house to escape the noise, and, while standing in the kitchen, she "heard a pop which was the first gunshot. So I crawled back to the living room trying to stay down from the windows, and got my phone, crawled -- was crawling back to the kitchen dialing 911, and two more pops." Ms. Loveday clarified that she heard one shot followed by a brief pause and then two more shots. Records from the 9-1-1 call center established that Ms. Loveday placed the call to 9-1-1 at 8:28 p.m.

The victim's other neighbor, graduate student Abigail Randall, testified that, on the evening of January 30, 2018, she was preparing dinner when she "heard three gunshots, about three in quick succession." She initially thought the sound might be fireworks until she "heard a woman's voice yelling." Ms. Randall stepped outside and saw the victim lying on the ground. She dialed 9-1-1 as she walked down her driveway because she thought "that something very bad was happening." Ms. Randall removed her gray hooded sweatshirt and used it to place pressure on the victim's wound as instructed by the 9-1-1 operator.

The victim's nephew, Sammy Moore, testified that the victim lived with Mr. Moore and Mr. Moore's mother, who was the victim's sister. At the time of the offense, the victim worked at the KFC on Chapman Highway and had been dating the defendant's mother, Christine Rivers, for five or six months. As far as Mr. Moore knew, "it was a good relationship." Mr. Moore said that the defendant, who lived with Ms. Rivers, and the victim had "[s]trong disdain for each other."

Mr. Moore said that the victim consumed alcohol "[w]hen he was awake. Often. All the time." The victim's drink of choice was "the strawberry Bud Light margaritas." He testified that it was the victim's habit on his days off to buy the Bud Light Strawberry Margaritas and pour them into "a canteen" that he would drink from throughout the day. The victim was off of work on January 30, 2018, and he and Mr. Moore spent much of the day together, during which time the victim consumed numerous Bud Light Strawberry Margaritas out of the canteen. At one point, Mr. Moore drove the victim to Kroger so that he could purchase flowers for Ms. Rivers and then drove the victim to Ms. Rivers' apartment to deliver the flowers. Mr. Moore left after a brief visit because the victim planned to spend the evening with Ms. Rivers. He returned home and, to his surprise, the victim returned home a short time later. The victim was upset with the defendant, so Mr. Moore suggested that the victim spend the evening with him. Mr. Moore explained that animosity between the defendant and the victim had been brewing for several months.

Mr. Moore drove the victim to the Weigel's on Chapman Highway so that the victim could purchase more strawberry margaritas. He recalled that, as they drove, the victim communicated with the defendant via cellular telephone "[j]ust multiple calls back

and forth. Not a whole one conversation." He said that the two men were cursing and calling each other out, explaining, "They were both . . . pretty hostile." At one point, the victim was in the parking lot of the Weigel's arguing with the defendant over the telephone when Mr. Moore spotted a police officer and told the victim "to just come on, get in the car, get off the phone." The victim hung up the phone, and they drove back home. Mr. Moore backed his car into the driveway, and the two men sat in the vehicle while the victim continued yelling and carrying on about the defendant.

Mr. Moore testified that the victim planned "to whup the [d]efendant," explaining that the victim "was a Golden Glove boxer so he was going to use what he used best." He said that the victim wanted to teach the defendant a lesson. Mr. Moore recalled, however, that the victim was "[o]ut of shape and he had a bad leg." In addition, the victim "had just had surgery" to get "stents put in 'cause he wasn't getting like, blood flow to his legs and such." Mr. Moore said that he tried to calm the victim down and persuade him to "[j]ust go in the house, lay down, sleep off his anger. 'Cause he was getting worked up. And I . . . know my uncle. And . . . I could tell he . . . was real mad, fired up." The victim eventually agreed to go inside, and Mr. Moore stayed outside to finish a cigarette.

Mr. Moore testified that just as the victim turned on his bedroom light, Mr. Moore saw "a white car pull up slowly, creeping up slow." The car drove down the street and then came back and parked across the street. The victim then came out of the house and did not look at or speak to Mr. Moore. Mr. Moore looked to his left and saw the defendant running. The victim and the defendant met at an access road near the parking lot of the South-Doyle Middle School. Mr. Moore said that "[t]he [d]efendant ran up, tried to Superman punch my uncle," explaining, "So he jumped in the air, leaped forward. That's what you call a Superman punch 'cause you're lunging forward like you're Superman." "After that, they get to tussling right there at the dot." He said that neither man landed any punches "that were flush. Just wild swings from both sides." Mr. Moore said that the victim's "pants came down a little bit and he stumbled" and that "[a]t that point, the [d]efendant raised from the hip. I seen the nose of the gun. My uncle raised his hands in the air." Mr. Moore heard the victim say, "'You going to shoot me?'" before the defendant fired a single shot. At that point, Mr. Moore ran to his house to alert his mother. As he ran back toward the men, he saw the defendant "fleeing away." The victim, he said, stood "up right there . . . and says, 'He shot me, Nephew. He shot me.'" Mr. Moore then shouted, "I know it's you, Kendall. I know it's you. I'm going to kill you, Kendall." He then saw the defendant get into the car and drive away. Mr. Moore insisted that he did not see the victim give any indication that he had a knife but admitted that he saw the small Sheffield knife that the victim routinely carried at the scene after the victim was taken to the hospital.

During cross-examination, Mr. Moore conceded that the victim was upset on

-3-

the day of the offense and that he wanted to find the defendant so that he could rough him up and teach him a lesson. He agreed that the two men telephoned each other repeatedly, noting that the victim "had a habit of hanging up in people's face that he was tired of talking to." Mr. Moore said that, despite his age, the victim was strong.

The victim's sister, Angie Crosby, testified that on the day of the offense, she got off of work early and was preparing to take a shower when she telephoned the victim to find out where he and Mr. Moore were. The victim told her they were pulling into the driveway, and she looked out the window and saw the car pull into the driveway. The victim told her "that he had been over at Christine['s] house and that him and [the defendant] had got into it." After speaking to the victim, Ms. Crosby got into the shower. When she got out of the shower, she heard Mr. Moore call for her and then heard "a couple of gunshots." Ms. Crosby put on her robe, went outside, and saw the victim standing alone across the street in the parking lot of the school. She saw Mr. Moore running toward the defendant but called out "to stop him." When Mr. Moore stopped, Ms. Crosby went back into the house to put something on under her robe, and when she came back outside, she saw the victim lying on the ground. She ran to the victim and saw that he had been shot. After the victim was taken from the scene, she used his cellular telephone to call several people, including the defendant and the defendant's mother.

Knoxville Police Department ("KPD") Officer Jeff Damewood testified that he was "working a[n] off-duty job at" the Kroger at the "Chapman Square Shopping Center at Chapman and Young High Pike" when the dispatcher "put out a call of a shooting on Taylor Road near South Doyle Middle School." Because Officer Damewood was "less than a quarter of a mile away," he responded to the scene. When he arrived, he observed the victim lying "in a grassy area next to a tree that is actually school property, right there behind the school on Taylor Road." He also saw a woman leaning over the victim "holding pressure to . . . some type of wound."

KPD Officer Derek White responded to the scene and was sent to 2710 Morning Crest Way, "where the suspect was." When Officer White arrived on Morning Crest Way, he saw the defendant "out in the parking lot area bleeding from the forehead, upper area." The defendant did not resist arrest, and Officer White placed the defendant into his patrol car "pretty quick just to secure him." The defendant's mother gave them consent to search the apartment, and Officer White and several other officers entered the apartment. Officer White said that he did not observe any signs that a struggle had taken place inside the apartment. He specifically did not see any broken furniture or lamps and did not observe any holes in the walls. Officer White recalled that officers found a weapon inside a closet in the apartment after communicating with someone on the telephone.

KPD Sergeant Brian Dalton, who was certified as an expert in firearms and

toolmark examination, testified that he examined the weapon found in this case and compared it with three recovered cartridge cases and a bullet recovered during the autopsy of the victim. He described the weapon as "a five-shot, double-action revolver" that "was made between 1905 and 1907." All three cartridge cases had been fired from the weapon, as had the bullet recovered during the autopsy.

During cross-examination, Sergeant Dalton testified that the amount of gunshot residue deposited on the surface around a gunshot could be measured to determine the distance from which the shot was fired. He said that this was determined by using the recovered weapon to fire shots from different distances to establish test patterns that could then be used to narrow down the distance. He was not asked to do that in this case. Sergeant Dalton explained that one would not only need "test patterns, you'd need to look at the environment. If you compare that to, like, an indoor firing range, it is set up as a downdraft so everything is pulled away from the firing point." Sergeant Dalton explained that "[a] contact shot typically leaves some telltale signs. But as soon as you start moving past about 12 inches, everything needs to be tested."

KPD Investigator Jeff Day acted as the lead investigator in this case. Investigator Day interviewed the defendant following his arrest and, during that interview, received the defendant's consent to search his cellular telephone. A video recording of that interview was exhibited to Investigator Day's testimony and played for the jury. After being informed of and waiving his constitutional rights, the defendant told officers that the victim was his mother's boyfriend and that he did not like the way that the victim treated him or his mother. The defendant told Investigator Day that he and the victim had a confrontation at his mother's apartment that included the victim's threatening to kill the defendant. The defendant said that he left the apartment, but the victim called him on his cellular telephone and called him names and threatened him. The defendant said that he eventually decided to fight the victim, so he drove to the victim's house. The defendant told the investigator that, as the two began to struggle, the victim sliced across his forehead with a knife. The defendant claimed that he fell and that the victim got on top of him and threatened to kill him. The defendant admitted that he had a pistol in his pocket when he went to the victim's house and that he shot the victim with the pistol. The defendant said that he fired the gun twice, aiming for the defendant's leg. The defendant said that after shooting the victim, he returned to his apartment and called the police. He insisted that he went to fight the victim but did not intend to kill the victim. He said that he took the gun because he was afraid of the victim, saying that the victim was "a big guy" who had bragged about having been to prison.

Investigator Day testified that the data extracted from the defendant's cellular telephone established that calls between the defendant and the victim on January 30, 2018, began at 7:21 p.m. and that the defendant telephoned the victim seven times between 8:13

p.m. and 8:24 p.m.  Instant messages between the defendant and a contact listed only as "Dodo" showed the defendant's telling Dodo at 7:05 p.m., "I just got into a fight, Fool." At 7:35 p.m., the defendant sent a text message to a contact listed as "Momma" that said, "Tell dude to quit calling my phone before I really hurt him."  A text message from the defendant's 13-year-old sister Kinsley sent at 9:49 p.m. read, "What about the gun?"  The defendant responded via text message 21 seconds later with "Throw it away."  Kinsley said, "Okay."  Later, the defendant sent a text to Kinsley that said, "Give the gun to the office."  Eventually, at 10:18 p.m., the defendant told her to give the gun to "Officer Wilson whenever you get home" and "say I put it under your mattress."  When Kinsley eventually replied, telling the defendant that the gun was in her closet, the defendant responded, "Okay.  Tell them where the gun [is] at."

Investigator Day testified that, when he reviewed the photographs and video recordings on the defendant's cellular telephone, one video recording in particular drew his attention.  The recording, which featured the defendant performing a freestyle rap while sitting in his car was played for the jury.  Parts of the recording are difficult to understand. The State espoused the following interpretation:

> IT'S GETTING REAL BIG BRO, LET'S GET REAL.  UHH . . . RIDING OUT LATE AT NIGHT . . . EYES OPEN WIDE. HUHH . . . . I AIN'T PLAYING N**** . . . WANT TO FIGHT . . . . ON THE PLAYGROUND, I REALLY BIG D***, MY S***, I'M THE SHOOTER B**** . . . UHM . . . PULL UP WIT A RUGER B****.  BUSSIN'.  I'MA DO THIS B**** . . . . AH AH AH . . . . AS I CREEP, LATE AT NIGHT, DOWN TO CREEP WHERE MICHAEL FIGHT.  F*** N****'S TRYING TO TRY ME.  I CAN'T LET HIM PICK ON ME. I'M HARD BODY B****.  I WAS BUILT FOR THIS S*** . . . YOU CAN'T F*** WITH ME CAUSE YE AIN'T DO THIS S***.  YE AIN'T RIDE FOR ME, YE AIN'T DIE FOR ME, YE AIN'T SITTIN' DOWN AND DO THE TIME FOR ME.  SPENDING MONEY ALL ON ME.  AHH AHHH . . . . CAUSE I'M A RIDER . . . .  SEEM LIKE LIFE GOT SO HARD.  I JUST PRAY LOUDER.  HMMMM.  HMMMMM. LIGHT A BOWL WITH A LIGHTER.  BAD LITTLE BIT IS SHAPED LIKE A BOTTLE.  COOLIN' LITTLE N** AND I LOVE POPPIN'.

Investigator Day obtained the video recordings from the surveillance cameras at South Doyle Middle School.  The video recordings and still photographs taken therefrom were entered into evidence.  The recording showed the defendant and the victim

"come together for approximately about four seconds, and then you see the muzzle flash of the weapon." Because the video cameras were motion activated, the entirety of the encounter was not captured.

Forensic testing of the victim's Sheffield knife, which was found at the scene, established the presence of human blood as well as the presence of a mixture of DNA, for which one of the contributors was a male. The sample was insufficient for any further testing.

Doctor Darinka Mileusnic-Polchan, Chief Medical Examiner for Knox and Anderson Counties, performed the autopsy of the victim. Doctor Mileusnic-Polchan testified that the victim suffered three "entrance gunshot wounds, two that appear to be exit gunshot wounds." "The first wound was located on the left upper chest" at approximately "the level of the areola." The entrance of that wound "appeared to be regular," which indicated to Doctor Mileusnic-Polchan that "there was no barrier or intermediate object between the muzzle and the victim." The bullet traveled downward, breaking a rib before entering the chest cavity, where "[i]t actually lacerated or tore part of the heart." The bullet pierced the victim's diaphragm and struck the liver, pancreas, and stomach before coming to rest in the lower lumbar region "relatively superficial under the skin on the left lower back." Doctor Mileusnic-Polchan described that wound as "the deadly wound" because it "involved many organs and in particular the heart."

The second gunshot wound "was on the right upper abdomen. . . . right under the rib cage." That wound "actually was survivable because it just cause[d] a contusion of the intestine but did not really perforate anything and exited in the lower lumbar region." The third gunshot wound was on the victim's left wrist. She said that there was no evidence that any of the wounds in this case occurred at close range. Toxicology testing established that the victim's blood alcohol concentration was .18 percent. Doctor Mileusnic-Polchan testified that she listed "multiple gunshot wounds" as the cause of death on the autopsy "because it's the totality of all the injury," but she said that the gunshot wound to the left chest actually caused all of the damage that led to the victim's death.

The defendant's mother, Christine Rivers, testified on behalf of the defendant. Ms. Rivers recalled that on January 30, 2018, she was in her bedroom "getting myself together to go out" with the victim as they had planned, when her daughter ran down the hallway to tell her that the defendant and the victim were "'into it.'" When Ms. Rivers walked to the front of the apartment, she saw that the victim "was upset" and "just yelling, like, I guess, talking to" the defendant. She said that the defendant had his hands out and his palms up. Ms. Rivers "kind of pushed [the victim] in the house. And I told [the defendant] to stay back for a minute." Ms. Rivers said that she pushed the victim into her bedroom, and "he was just saying, 'Well, Christine, I -- you know, I'm going to kill

him tonight.'" At that point, Ms. Rivers "got kind of upset with him telling me that he was going to kill my son," so she told him to leave. The victim became upset with Ms. Rivers and took the vase containing the flowers he had just brought her "and threw it into the wall." The victim then threw one of her night tables at the wall. At that point, a neighbor came into the apartment and restrained the victim inside the apartment before taking the victim home.

Ms. Rivers testified that sometime later, the victim called her and said that he needed his work uniforms, which he had laundered at her apartment that day. Ms. Rivers drove to the victim's house to deliver the uniforms but did not stay at the house. She described the victim as "just mad" at that point. After she left, the victim called her more than once, "cursing" and "saying real bad stuff." Eventually, the victim called and told Ms. Rivers that the defendant was at his house and then hung up. Ms. Rivers got into her car and drove toward the victim's house. Before she got there, Ms. Crosby called her and said, "'[Y]our son Kendall just shot my brother.'"

Ms. Rivers said that when she arrived at the scene, she saw that the victim had been shot. She left the scene after finding out which hospital the victim would be taken to. Ms. Rivers said that, before driving to the hospital, she went home to look for the defendant. She found the defendant standing outside their apartment "shaking" and "covered in blood on his face." She was at the apartment when the police arrived. After the police took the defendant to the police station, Ms. Rivers drove to the hospital to check on the victim. After learning that the victim had died, she went back to her apartment, where she learned from the police that the defendant had told them "where the gun was."

During cross-examination, Ms. Rivers acknowledged that she was aware that the defendant did not like the victim, saying that "[h]e just didn't like the way [the victim] would treat me." She said, however, that the two men were "nice to each other in front of me."

The 22-year-old defendant testified that on January 30, 2018, the victim visited Ms. Rivers at their apartment. At one point, the victim "was coming from the back room to go outside to smoke a cigarette" as the defendant "was coming from the back" carrying a plate and a cup. He said that the victim "pull[ed] the door, knocked the plate out my hand." The defendant told the victim, "Damn, you just knocked the plate out of my hand," and the victim "put his finger in my face, and sa[id], 'You going to respect me.'" The defendant told the victim he was "not trying to hear that s***," and the victim "blew up and pushed me in my shoulder to get me [to] turn around to him." The defendant said that he was "confused because I should be the mad one." The defendant's mother and sister then came from the back of the apartment. The defendant's sister held him back while Ms. Rivers held the victim back. The defendant heard the victim say, "'I'm going to

-8-

kill him.  I'm going to hurt him.'"  The defendant said he left the apartment after Ms. Rivers asked him to do so, explaining that his mother was "a pretty good mediator, so I knew she'll resolve the problem."

The defendant testified that he went to a park near his apartment to cool off. While he was there, the victim called him on his cellular telephone and said, "'Where are you, you p****, you p**** boy."  The defendant said that he "really laughed at it in his face.  And I guess that made him more madder."  The defendant hung up, but the victim "called back.  He got to talking.  I hung up in his face and I end up going home."

The defendant testified that, when he got home, he saw that his mother's bedroom had "holes in it, broken lamps, glass everywhere."  He said that he "was pretty upset" because his mother was "a single woman and everything she owns she worked hard for."  The defendant said that "at that time [the victim] was calling me saying, 'Where you at?  Come to me.'"  The defendant said that the victim "wouldn't quit.  He wouldn't let up."  The defendant testified that he decided to go and fight the victim and that he "took a gun with me just in case, for protection," saying that the victim had previously told him "that he'd been to prison and he seen a lot and he'd been shot five times."

The defendant testified that when he arrived at the victim's house, he saw the victim coming toward him "taking his shirt off."  The defendant ran toward the victim "with my fist up about to fight.  And he cut me in the face and I went down."  He said that, at that point, he reached into his pocket, grabbed the gun, closed his eyes, and pulled the trigger.  The defendant claimed that he "was scared.  I thought I was about to die."  The defendant insisted that he pointed the gun at the victim's leg, "pulled the trigger[,] and took off running to my car and called the police and notified them [of] everything.  I was scared."  The defendant said that, although he told the police that he had fired the gun twice, he could not be sure how many times he fired.  The defendant acknowledged that the video surveillance footage did not show the victim on top of the defendant, but he said that he "just felt like that he was on top of me, like at that time, like, that was . . . just a bad experience."  The defendant said that he had no idea when he left the scene whether any of the gunshots had struck the victim.  The defendant said that if he could "rewind time, I wouldn't ever done it."

During cross-examination, the defendant conceded that he was aware that the victim had recently had surgery on his leg but said that the victim "was walking around pretty good.  He . . . already recovered."  The defendant acknowledged that the victim drank a lot.  The defendant admitted being upset that his mother made excuses for the victim's poor treatment of her.  The defendant said that his "Uncle Jake" had given him the gun that he used to shoot the victim and agreed that he did not have a permit to carry the handgun.  He insisted that he kept the gun to protect his family because they lived in a

rough area. The defendant claimed that he never bought ammunition for the gun and that he had only "the bullets that came with it." He maintained that he had only fired the gun one time before the shooting. The defendant said that he called the police to report the shooting as soon as he returned home; his cellular telephone records showed that he telephoned at 8:43 p.m.

The defendant denied using the victim's name in his freestyle rap video, saying that he had "no reason to say [the victim's] name." He insisted that he instead said, "Creep with my pipe." He admitted that the term "bussin'" referred to shooting. He said that the phrase "I'm a rider" as he used it meant "do whatever for a person or . . . be there for a person." He admitted using the term "f*** n****" and said that the listener could take the term "however you want to take it."

During redirect examination, the defendant agreed that he often chose words to use in his freestyle raps for their flow rather than their meaning.

Based upon this evidence, the jury convicted the defendant of the lesser included offense of voluntary manslaughter. Following a sentencing hearing, the trial court imposed a sentence of six years' incarceration.

In this timely appeal, the defendant challenges the admission of the rap video obtained from his cellular telephone and the propriety of the sentence.

## I. Admission of Video

The defendant asserts that the trial court erred by admitting into evidence the amateur rap video recording obtained during the search of his cellular telephone because it was irrelevant and that, even if it was marginally relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. He argues that, instead of evidence of a plan to harm the victim, the performance was just that, a performance. The State contends, as it did at trial, that the video was relevant to establish that the defendant committed a knowing killing.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

The probative value of the video recording was not particularly high given that the proof overwhelmingly established that the final conflict between the defendant and the victim was the culmination of several hours of arguing. Both second degree murder and voluntary manslaughter require the State to prove that the defendant acted knowingly. *See* T.C.A. §§ 39-13-210(a)(1); -211(a)(1). The defendant's mentioning his well-documented disdain for the victim in an amateur rap performance that also included references to shooting arguably supported this element. That being said, the admission of the video likely had little impact on the jury, as evidenced by its verdict convicting the defendant of the lesser included offense of voluntary manslaughter, an offense that would have been supported by the evidence adduced at trial even in the absence of the video. Consequently, even if the trial court erred by admitting the recording, any error was harmless.

## II. Sentencing

The defendant challenges the propriety of the sentence imposed, arguing that the trial court erred by imposing the maximum sentence within the range and by denying all forms of alternative sentencing. The State asserts that the trial court did not err.

At the sentencing hearing, the trial court heard from the victim's family members regarding the impact of his death. The trial court found that, regardless of "who made the first phone call, who shouted out the first insult," the defendant "created the confrontation" by going to the victim's home. The court also found that the defendant went to the victim's home "knowing that you were strapped, that you had your gun with you. You didn't have to show up, and you sure didn't have to bring the gun with you." The court applied enhancement factor (1), that the defendant had a history of criminal behavior in addition to that necessary to establish the appropriate sentencing range, on the basis that officers discovered marijuana in the defendant's car following his arrest and that the defendant was not licensed to carry a gun, but the court did not give that factor "too much weight." *See* T.C.A. § 40-35-114(1). The court also applied enhancement factor 10, that the defendant had no hesitation about committing a crime when the risk to human life was high, but "place[d] little weight on that." *See id.* § 40-35-114(10). Finally, the court applied enhancement factor (9), that the defendant employed a firearm during the commission of the offense, *see id.* § 40-35-114(9), and "place[d] an enormous amount of weight on the fact that you chose to arm yourself and go create this encounter." Based upon these findings, the court imposed a sentence of six years, the maximum within the range. The trial court also denied all forms of alternative sentencing, finding that to impose "anything less than what I'm getting ready to do would depreciate . . . the seriousness of this offense. You took another human being's life by the decisions you made that evening."

-11-

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709. The abuse-of-discretion standard of review and the presumption of reasonableness also applies to "questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Without question, the trial court erred by applying enhancement factor 10 in this case because the risk to human life is inherent in the offense of voluntary manslaughter, and no evidence suggested a high risk to the life of anyone other than the victim. The record is clear, however, that the trial court placed little weight on that factor and instead based its imposition of the six-year sentence on the defendant's use of a firearm. In our view, despite the misapplication of a single enhancement factor, the trial court did not abuse its discretion by setting a sentence length of six years.

The imposition of a six-year sentence mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less . . . ."). Traditionally, the defendant has born the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

When a trial court orders a fully-incarcerative sentence, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

(1) Sentences involving confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1).

When, as here, "the seriousness of the offense forms the basis for the denial of alternative sentencing," the record must establish that "the circumstances of the offense as committed [were] especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006) (citations and internal quotation marks omitted).

The record establishes that the defendant managed to turn what began as an argument over spilled food into a deadly confrontation. Although the record indicates that the victim gave as good as he got during the verbal sparring that took place over the course of the evening, it was the defendant who escalated the conflict. Despite expressing a desire to teach the defendant a lesson, the victim did not go find the defendant. It was the defendant who traveled to the victim's home to confront the victim. Not satisfied with confronting the victim at home, by his own account, the defendant elected to go home and arm himself with a loaded handgun. As the trial court observed, the defendant's decision to bring a loaded gun to confront the victim directly resulted in the victim's death. That decision bespeaks an amount of planning and forethought atypical in voluntary manslaughter cases, which, by definition, occur in the heat of passion. The evidence established that the defendant's conduct "was sufficiently reprehensible and offensive, and the nature of the offense is such, as to require incarceration to avoid depreciating the seriousness of the offense." *State v. Carter*, 254 S.W.3d 335, 348 (Tenn. 2008) (citing T.C.A. § 40-35-103(1)(B); *Trotter*, 201 S.W.3d at 654). Under these circumstances, we conclude that the trial court did not abuse its discretion by ordering a fully incarcerative

sentence.

Accordingly, the judgment of the trial court is affirmed.

_____

JAMES CURWOOD WITT, JR., JUDGE